## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL GRAVES, | ) | |
| an individual, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | **COMPLAINT** |
| | ) | |
| *Defendant.* | ) | **[JURY TRIAL DEMANDED]** |
| _____ | ) | |

1.      Plaintiff James Michael Graves seeks relief from Defendant 3M Company's pattern of discriminatory and illegal behavior against employees who hold sincere religious and medical objections to 3M's COVID-19 vaccination mandate.

2.      In October 2021, Defendant imposed an unnecessary, draconian COVID-19 vaccine mandate for all employees.

3.      Defendant refused to accept and accommodate Plaintiff's sincere objections to the vaccine.

4.      Defendant's unlawful actions left Plaintiff with the impossible choice of suffering a physical assault and uninvited invasion of his body by receiving the experimental and harmful mRNA COVID-19 vaccine, at the expense of his religious beliefs, bodily autonomy, medical privacy, and possibly health – or losing his livelihood.

5.      This Faustian bargain is no bargain at all and is precisely what is forbidden by federal and Georgia civil rights law.

6.      Defendant's actions violated federal and Georgia law by mandating an experimental medical treatment, failing to provide reasonable accommodations for exemptions, and violating the sacred rights of privacy and bodily integrity.

7.      Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Georgia against precisely such employment discrimination.

## PARTIES

8.      Plaintiff James Michael Graves ("Graves" or "Plaintiff") was employed as a solutions instructor for 3M. He primarily worked from home, and was based out of 3M Medical Solutions in Norcross, Georgia. Graves is a resident of Monroe, Georgia.

9.      3M Company ("3M" or "Defendant") is a technology company that manufactures health, safety, industrial and consumer products. As of 2021, 3M employed nearly 100,000 employees worldwide. 3M is headquartered in Saint Paul, Minnesota. Plaintiff worked at Defendant's location in Norcross, Georgia, Gwinnett County.

## JURISDICTION AND VENUE

10.      This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

12.      An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**3M's Discriminatory Treatment of Plaintiff**

13.      In September 2021, Defendant mandated that Plaintiff become fully vaccinated for COVID-19 by December 8, 2021. All salaried employees were subject to the same requirement.

14.      That initial requirement and December 8, 2021 deadline was suspended, but 3M reinstated the vaccination requirement after the Centers for Medicare and Medicaid Services in late October 2022 mandated COVID-19 vaccinations for Medicare and Medicaid providers and suppliers.

15.      Plaintiff worked as a "solutions instructor" for 3M Medical Solutions in Norcross, Georgia.

16.      He trained physicians on the use of speech recognition software that allowed them to dictate their notes into a patient's medical record, rather than type in the notes.

17.      Plaintiff has been with the company for 38 years. When he started his position in January of 1984, the company was named Lanier Dictation Systems. It was the main competitor to Dictaphone, a leading dictation machine company that had been founded by Alexander Graham Bell, the inventor of the telephone.

18.      Lanier Dictation Systems was sold, spun off, and changed its name various times during Plaintiff's employment, including in 2019 when 3M completed its acquisition of the company, which then was known as M*Modal.

19.      Plaintiff holds sincere religious objections to receiving the COVID-19 vaccine.

20.      Plaintiff is a Baptist, and he objects to the use of fetal cells in the development of the COVID-19 vaccines.

21.      During his 38 years at the company, some customers didn't want in-person visits from employees who hadn't been vaccinated for such things as the flu – while other clients didn't care.

22.      When the COVID pandemic hit, 3M and a number of hospitals to which 3M sells equipment didn't want consultants, such as Plaintiff, to do training in person. So, at the company's direction, Plaintiff transitioned primarily to remote training, which worked well.

23.      Plaintiff sought a religious exemption and accommodation from 3M's vaccination requirement.

24.      Plaintiff suggested a number of accommodations as possible / reasonable alternatives to vaccination.

25.      He had been working primarily from home for two years. As an accommodation, Plaintiff suggested that 3M let him continue working remotely.

26.       There were some accounts that did not require vaccination that Plaintiff was able to visit in person while adhering to the customer's protocol of simply wearing a mask while on site. He suggested that he could continue wearing a mask while visiting those accounts.

27.       Plaintiff further suggested that he would continue to visit the customers that didn't require or mandate  vaccinations. If a client insisted on vaccinations, Plaintiff suggested that 3M send an alternate  trainer who had been vaccinated – an accommodation that had been made in the past as company policy.

28.     3M rejected all of Plaintiff's suggested accommodations – which had previously been viewed as reasonable and were company policy before 3M's acquisition in 2019 of M*Modal.

29.      On October 25, 2021, Plaintiff submitted his vaccination accommodation request to 3M, via an online form that disappeared and was no longer retrievable or viewable once he clicked "submit."

30.     Plaintiff was shortly thereafter asked some followup questions to supplement his accommodation request , which he promptly answered in detail.

31.     Plaintiff repeatedly asked human resources and his supervisor for a copy of his initial accommodation request responses – but repeatedly received nothing but vague excuses as to why that documentation was unavailable, and ultimately did not receive said documentation until the day after he was fired in late May.

32.     Graves was subjected to discriminatory treatment, harassment, and a hostile work environment due to Defendant's COVID-19 vaccine mandate.

33.     3M could have made the accommodations. In fact, 3M had Plaintiff work on-site the very week it put him on administrative leave for not getting vaccinated.

34.      That was the first week of May, 2022, when Plaintiff was one of eight to 10 trainers who went on-site to Ochsner Healthcare, a large account in Lafayette, Louisiana.

35.     At the end of that week, after hosting onsite training at Ochsner Healthcare, 3M put Plaintiff on administrative leave for being "non-compliant" in regards to COVID vaccination.

36.     In late May of 2022, 3M terminated Plaintiff's employment.

37.     Plaintiff has suffered financial and emotional damages due to being fired.

38.       He lost his salary of roughly $100,000 a year.

39.       Plaintiff lost his medical insurance and now pays around $500 a month out-of-pocket for health insurance.

40.       He lost 3M's contribution to his 401K account.

41.       Plaintiff is 64 years old, and at his age, companies are much less likely to want to hire and train him, because they expect he will retire soon.

42.       When Plaintiff was fired, he had a nest egg of about $60,000 set aside. Despite living frugally, he and his wife – who has a small Social Security disability income – have seen those savings slowly depleted to $23,000.

43.       Plaintiff filed a discrimination complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

44.       Plaintiff received a Notice of Right to Sue from the EEOC on December 1, 2022. *See* Exhibit A. This Complaint has followed.

**COVID-19 Vaccines Manufacturing Process**

45.       Plaintiff holds sincere religious concerns surrounding the process used to manufacture the vaccines.

46.       Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt

below).[1]



47.     For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically

PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

48.     In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical

staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to

produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered

from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

49.     The Louisiana Department of Health likewise confirms that the Johnson &

Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line

that was isolated from a terminated fetus in 1985."[4]

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] La. Dept of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added) (last visited Oct. 24, 2022).

50.      As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293

was used during the research and development phase.[5] All HEK 293 cells are descended

from tissue taken in 1973 from either an elective abortion or miscarriage[6] that took place

in the Netherlands.[7]

51.      While the production of the vaccines did not reportedly require any new

abortions, Plaintiff objects to receiving the COVID-19 vaccines on the basis that, even

assuming the vaccines do confer a meaningful health benefit, that benefit is one from ill-

gotten gains.

52.      Plaintiff believes any benefit the COVID-19 vaccines may confer flows from the

unjust exploitation of unborn human life. On this basis alone, Plaintiff refused on

religious grounds to accept or be forced to accept the COVID-19 vaccines.

**Defendant Cannot Show that Allowing Unvaccinated Employees to Stay Would Cause an Undue Hardship**

53.      Defendant denied Plaintiff's religious exemption on the grounds that granting it

would impose an undue hardship on Defendant.

54.      The only grounds for claiming undue hardship would be the claim that

unvaccinated employees would pose a risk to their coworkers.

55.      Where (1) the COVID-19 vaccine is not effective at reducing infection; (2) the

COVID-19 vaccine is not effective at preventing transmission, (3) natural immunity to

SARS-CoV-2 is preferential to vaccine-induced immunity, and (4) the vaccine poses

---

[5] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).
[6] *COVID-19 Vaccine and Fetal Cell Lines.*
[7] *Ibid.*

abundant health risk, Plaintiff not only poses no risk to fellow 3M employees but are themselves put at risk from Defendant's mandate.

### The COVID-19 Vaccine Does Not Prevent Infection or Transmission

56.     The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

57.     A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship between percentage of population fully vaccinated and new COVID-19 cases."[8] Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[9]

58.     Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[10]

---

[8] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.

[9] *Ibid.*

[10] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

59.        Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[11] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

60.        A paper published in *Eurosurveillance*, a journal published by the European Centers for Disease Control, documents a significant outbreak of COVID-19 among fully vaccinated patients and staff at a hospital in Tel Aviv.[12] At the time of the outbreak, investigators determined 238 out of 248 of exposed patients and staff had been fully vaccinated with Pfizer's mRNA vaccine. Ultimately, 39 out of the 238 exposed vaccinated people (16 percent) were infected, along with 3 out of 10 unvaccinated people - a difference that doesn't reach statistical significance because the unvaccinated group is too small. Of the infected, 23 were patients and 19 staff.[13] The staff all recovered quickly, but five patients died and another nine had severe or critical cases. ***All were vaccinated***. On the other hand, the two unvaccinated infected patients both had only ***mild*** cases of COVID-19.

---

[11] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).
[12] Pinina Shitrit, et. al., *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021*, (July 2021) available at https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2021.26.39.2100822#html_fulltext (last visited on Oct. 3, 2021).
[13] *Nosocomial outbreak caused by the SARS-CoV-2 Delta variant in a highly vaccinated population, Israel, July 2021.*

61.      A senior Pfizer executive recently admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[14]

62.      It should, therefore, come as no surprise that in their real-world application the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

***Natural Immunity is Durable, Lasting, and Superior to Vaccination***

63.      Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

64.      There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[15] However, Defendant wholesale disregards the relevance of natural immunity entirely.

65.      A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2

---

[14] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

[15] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[16]

66.     Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19.[17] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."[18]

67.     Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[19] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[20]

[16] *See, e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).
[17] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).
[18] *Ibid.*
[19] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).
[20] *Ibid.*

68.     The Cleveland Clinic researchers concluded: "***Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination***, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[21]

69.     Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

70.     Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

71.     Forcing Plaintiff to receive the COVID-19 vaccines would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

72.     All three of the COVID-19 vaccines available in the United States are marketable under Emergency Use Authorization ("EUA") and based entirely on a limited set of clinical trials executed over a matter of mere months before vaccines were administered to the public. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

73.     Though the FDA has approved the use of Comirnaty for future use, Pfizer has admitted that Comirnaty is not currently available to the public.

74.     There has never been a successful coronavirus vaccine in history.

---

[21] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

75.     Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which Covid vaccines can any longer claim credit for.

76.     Recent reporting data presents an alarming picture: as of the time of this filing, there have been 31,446 deaths reported to VAERS from COVID-19 vaccines and 1,591,545 total adverse events.[22]

77.     The input of event reports to VAERS since the COVID vaccines were rolled out is *far greater than all cumulative adverse event reports to VAERS for the prior 30 years*: an alarming statistic.

78.     This data is likely staggeringly underestimated, as past attempts to investigate VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[23] The CDC has failed to account for this underreporting.

---

[22]

https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=0E84A6725F6EA0434A7910838E0C; Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).

[23] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.

79.      Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.[24]

80.      COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

81.      Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males.[25] Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

82.      Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier. It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

83.      We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone

---

[24] *Horowitz: German insurance claims hint at millions of unreported COVID vaccine injuries*, August 15, 2022, available at https://www.conservativereview.com/horowitz-german-insurance-claims-vaccine-injury-2657863726.html.

[25] Krug A, Stevenson J, Høeg TB. BNT162b2 Vaccine-Associated Myo/Pericarditis in Adolescents: A Stratified Risk-Benefit Analysis. Eur J Clin Invest. 2022 May;52(5):e13759. doi: 10.1111/eci.13759. Epub 2022 Mar 4. PMID: 35156705; PMCID: PMC9111575; Gill J, Tashjian R, Autopsy Histopathologic Cardiac Findings in 2 Adolescents Following the Second COVID-19 Vaccine Dose. Arch Pathol Lab Med (2022); 146(8): 925-929. Doi: https://doi.org/10.5858/arpa.2021-0435-SA; Watanabe S, Hama R, SARS-CoV-2 vaccine and increased myocarditis mortality risk: a population based comparative study in Japan. Oct 18 2022, doi: https://doi.org/10.1101/2022.10.13.22281036.

marrow, liver, adrenal glands, and especially the ovaries.[26] Since there exists no way to turn off spike production, the actual dose of spike protein may vary by orders of magnitude from person to person. Strong but not yet conclusive evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

84.     The potential adverse effects Plaintiff faces in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes him to a variety of health risks ranging from headaches and blood clots to death.

85.     The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

86.     Given these proven facts, which were accessible at the time that 3M implemented its vaccine mandate, Defendant knew or should have known that allowing Plaintiff to continue at his positions would not pose a risk or undue burden to 3M.

**Employers Who Have Failed to Provide Reasonable Accommodations for Vaccine Mandates Have Been Held Liable**

87.     The discouragement or denial of religious accommodations from employers' mandatory vaccine policies has been found unlawful, even when those mandates were

---

[26] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* The Defender (June 3, 2021), https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

proscribed by hospitals. Indeed, numerous employers have been sued and lost over forced vaccines. *See, e.g. EEOC v. Mission Hosp. Inc.*, No. 1:16-cv-118-MOC-DL, 2017 WL 3392783 (W.D.N.C. Aug. 2017) [resulting in permanent injunction against the employer from improperly denying religious exemptions from mandated vaccines and requiring employer to pay $89,000 in damages]; *United States v. Ozaukee County*, No 18-cv-343-pp (E.D. Wis. 2018) [resulting in a permanent injunction against the employer for failure to grant religious exemptions from compulsory vaccines and order payment of damages to employee].

88.     Likewise, in *EEOC v. Saint Vincent Health Center*, Civil Action No. 1:16-cv-234 (2016), the employer agreed to pay $300,000 to a class of six aggrieved former employees and provided substantial injunctive relief to settle a religious discrimination lawsuit based upon a failure to grant a religious exemption as part of a mandatory seasonal flu vaccination requirement for its employees.

89.     Moreover, in *EEOC v. Memorial Healthcare*, Civil Action No. 2:18-cv-10523 (2018), the defendant employer paid $74,418 ($34,418 in back pay, $20,000 in compensatory damages and $20,000 in punitive damages) for refusing to hire a medical transcriptionist because of her religious beliefs against receiving flu shots and refusing to accommodate those beliefs.

90.     In fact, as recently as 2018, the U.S. Equal Employment Opportunity Commission sued Nashville-based Saint Thomas Health, after the employer failed to make a reasonable religious accommodation for the flu vaccine. *EEOC v. Saint Thomas Health*, Civil Action No. 3:18-cv-00978 (M.D. Tenn. 2018).

91.     The *Saint Thomas Health* case resulted in a consent decree enjoining the employer from failing to provide religious accommodations to an employee's sincerely held religious beliefs unless such requests created an undue hardship. The decree also awarded the injured employee $75,000 in damages and directed the employer to issue the employee an apology letter.

92.     Indeed, on November 12, 2021, the U.S. Court of Appeals for the Fifth Circuit granted a stay of the Occupational Safety and Health Administration's nationwide vaccine mandate, stating that the mandate "raises serious constitutional concerns" and that "a denial of the petitioners' proposed stay would do them irreparable harm," as the Mandate threatens to substantially burden the liberty interest of reluctant individual recipients put to a choice between their job(s) and their jab(s)." BST Holdings v. OSHA, Order Granting Stay (U.S. Ct. App. 5th Cir.) (November 12, 2021). In implementing the mandate, the 5th Circuit concluded that OSHA likely "violates the constitutional structure that safeguards our collective liberty." *Ibid.*

93.     What is more, on November 21, 2021, the Honorable District Judge William LaFortune of the Tulsa County District Court granted the State of Oklahoma's application for a temporary restraining order against Ascension Healthcare, after the hospital rode roughshod over the religious rights of its employees by imposing a draconian vaccine mandate similar to 3M's. *O'Connor v. Ascension Healthcare*, Case. No. CJ-2021-3251 (Tulsa Cnty. Dist. Ct. 2021) (docket publicly accessible on OSCN.net); *See also O'Connor v. Ascension Healthcare*, Case No. 21-CV-488-TCK-SH (N.D. Okla. 2021) (the Honorable Judge Kern remanding the case to Tulsa County District Court for further proceedings).

## FIRST CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

94.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

95.     Title VII prohibits "discriminat[ion] against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (2015).[27]

96.     Title VII imposes upon an employer the duty to make reasonable accommodations for the religious observances short of incurring an undue hardship.

97.     Once an employee has established a prima facie case of discrimination, the burden shifts to the defendant to show that it could not reasonably accommodate the employee without undue hardship. *Maroko v. Werner Enterprises, Inc.*, 778 F. Supp. 2d 993 (D. Minn. 2011).

98.     Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

---

[27] As the Supreme Court has recognized, employees' "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [legal] protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Additionally, though membership in or adherence to the tenets of an organized religion is plainly sufficient to provide protection for an individual's sincerely held religious beliefs, it is not a necessary precondition. *See Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)

99.       Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

100.       Defendant took adverse employment action against Plaintiff by terminating employment punishing Plaintiff due to his religious objections to the vaccine.

101.       By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiff due to his religious beliefs.

102.       Defendant's failure to provide religious accommodations has substantially injured Plaintiff.

103.       On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

104.       Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiffs' religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several additional reasons.

105.       First, upon receiving Plaintiff's request for a religious accommodation, Defendant did not give that request the individualized consideration demanded by Title VII. In the EEOC's recent Technical Assistance, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (the "COVID-19 Technical Assistance", the EEOC addressed this precise issue.[28] In the COVID-19 Technical Assistance, the EEOC posed the following question: "Under Title VII, how

---

[28] *See* https://www.eeoc.gov/newsroom/eeoc-issues-updated-covid-19-technicalassistance, last visited on September 26, 2021.

should an employer respond to an employee who communicates that he . . . is unable to be vaccinated . . . because of a sincerely held religious belief." *Id*. at K.12. The EEOC's response was as follows:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting the COVID-19 vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship . . . . Under Title VII, an employer should thoroughly consider all possible reasonable accommodations . . . . In many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances.
> *Id*. (emphasis added).

Elsewhere in that document, the EEOC identified the types of reasonable accommodations employers must consider when they receive requests for religious accommodations, including "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment (such as [modification] to ventilation systems or limiting contact with other employees and non-employees," and "regular hand washing." *Id*. at K.5.

106.      Here, Defendant failed to "thoroughly consider all possible reasonable accommodations," as required by the EEOC and provided a far cry from the "individualized" assessment required by the EEOC. *Id*. at K.5.

107.      Second, Defendant cannot show that affording Plaintiff the types of accommodations the EEOC identified in the COVID-19 Technical Assistance as being reasonable in the context of employer vaccination policies—i.e., "masks," "testing," "telework," "social distancing protocols," "making changes in the work environment," "hand washing," etc.—would impose an undue hardship on it.

108.        Third, Plaintiff had been largely working remotely. Plaintiff therefore posed little to no threat of either catching or transmitting COVID-19 to clients or to or from fellow employees.

109.        Defendant cannot show that allowing Plaintiff to continue in his position as he had been successfully doing, let alone denying alternative reasonable accommodations such as masking, would have imposed an undue hardship.

110.        Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M or its operation.

111.        As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against them on the basis of his religious beliefs and failing to provide reasonable accommodation.

## SECOND CAUSE OF ACTION
### Disability Discrimination
**[Violation of the Americans with Disabilities Act; 42 U.S.C. § 12010 et seq.]**

112.        Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

113.         The Americans with Disabilities Act of 1990, set forth in 42 U.S.C. §§ 12010 et seq. (hereinafter the "ADA Act") prohibits any covered entity from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

114.           Under the ADA, an individual has a protected disability if he or she either has a "physical or mental impairment that substantially limits one or more major life activities …" (ADA Act, § 12102(1)(A)), or is: "*being regarded as having such an impairment* []." (*Id.,* at subparagraph (C)) (emphasis added).

115.           Under section 12102(3)(A) of the ADA Act: "An individual meets the requirement of 'being regarded as having such an impairment', if the individual establishes that he or she has been subjected to an action prohibited [by the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment substantially limits, or is perceived to substantially limit, a major life activity." (See also, 28 Code of Federal Regulations ("C.F.R.") §§ 35.108(f)(1) and 36.105(f)(1).)

116.           "An employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *US Airways, Inc. v. Barnett,* 535 U.S. 391, 395 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added). The burden of persuasion falls on the employer.

117.           An employer has a duty under the ADA to engage in an "interactive process" with the employee to determine whether, based on an *individualized assessment* of the employee's needs, a reasonable accommodation is possible.

118.           Defendant failed to engage in an interactive process with Plaintiff and to conduct an individualized assessment of his unique circumstances.

119.          3M discriminated against Plaintiff based on a perceived disability: being

unvaccinated.

120.          Defendant regarded unvaccinated individuals as being "disabled" and

unable to perform the duties of their employment.

121.          Based on this perceived disability, Defendant discriminated against

Plaintiff by threatening termination if he failed to receive the COVID-19 vaccine, a

"condition" regarded as a disability under 3M's policy.

122.           Plaintiff was terminated due to his COVID-19 vaccination status, despite

the fact that Plaintiff has successfully performed within the same respective position from

which he was just removed since before COVID-19 was introduced to the world.

123.          By pattern and practice, virtually every employer in America has shown

that reasonable accommodations and alternatives to vaccination indeed exist for

employees, and these have been required all along since the inception of COVID: self-

screening with temperature checks, wearing personal protective equipment (PPE), and

complying with other various safety protocols until the number of COVID infections

reduced to acceptable levels.

124.          Defendant cannot show that offering alternative, less-intrusive

accommodations would cause an undue hardship, for the same reasons outlined in the

context of Defendant's religious discrimination.

125.          Defendant's failure to provide accommodations has harmed and continues

to harm Plaintiff.

126.    By failing to engage in the interactive process, offer any reasonable accommodation, and constructively terminating Plaintiff based on his medical decision, Defendant's discriminatory actions were in violation of the ADA.

**THIRD CAUSE OF ACTION**
**Religious Discrimination**
**[Violation of the Georgia Human Relations Act; 43 P.S. § 955(a)]**

127.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128.    The Georgia Human Relations Act declares that it is an unlawful practice for an employer "[t]o fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, ***religion***, national origin, sex, disability, or age…" GA Code § 45-19-29(1) (emphasis added).

129.    "Religion" means all aspects of religious observance and practice as well as belief. GA Code § 45-19-22(7).

130.    Defendant is an "employer" as defined in GA Code § 45-19-22(5).

131.    Defendant has a duty to reasonably accommodate Plaintiff's religious observance or practice, absent an undue hardship on the conduct of Defendant's operation. GA Code § 45-19-22(4).

132.    Plaintiff asserted bona fide religious beliefs that conflicted with 3M's mandatory vaccine policy and notified 3M of those beliefs by filing an exemption and accommodation request per 3M's policies.

133.    Plaintiff offered numerous alternative accommodations that would not infringe on his sincerely held religious beliefs but aimed to address 3M's concerns.

134.          Defendant 3M utterly failed to offer any reasonable accommodation, failed to engage in the interactive process with Plaintiff, failed to perform an individualized assessment of Plaintiff's request, and ultimately denied Plaintiff's religious exemption.

135.          Defendant took adverse employment action against Plaintiff by terminating employment and punishing him for his sincere religious beliefs.

136.          By denying reasonable accommodation and executing punitive measures against Plaintiff, Defendant discriminated against Plaintiffs due to their religious beliefs.

137.          Defendant's failure to provide religious accommodations has substantially injured Plaintiff.

138.          On these facts, Plaintiff establishes a prima facie case that shows Defendant failed to make any reasonable accommodation and violated Plaintiff's Title VII rights.

139.          Because Plaintiff will be able to establish a prima facie showing, the burden shifts to Defendant to show that it could not accommodate the Plaintiff's religious needs without undue hardship. *Tepper,* at 514. Defendant is unable to make this showing for several reasons.

140.          Defendant cannot show that allowing Plaintiff to continue in his position as he had been successfully doing, let alone denying alternative reasonable accommodations such as the ones that Plaintiff proposed, would have imposed an undue hardship.

141.          Fourth, evidence available at the time Plaintiff was terminated, reinforced by evidence that has come forth since, demonstrates that the COVID-19 vaccine is

ineffective at preventing both infection and transmission. Declining to take the vaccine could therefore not cause any legitimate burden on 3M, its employees, or its operation.

142.        As such, Defendant has violated Plaintiff's rights under Title VII by discriminating against him on the basis of his religious beliefs and failing to provide reasonable accommodation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

a. A finding that Plaintiff has a fundamental right to his bodily autonomy, and to make health decisions in accordance with his beliefs and conscience.

b. A finding that Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Georgia Fair Employment Practices Act.

c. Enjoin Defendant from taking any further adverse employment action against Plaintiff;

d. Enjoin Defendant from taking any similar discriminatory adverse employment action against any other 3M employee;

e. An order that Plaintiff be compensated, to the extent allowable under Georgia state and Federal law, for his monetary damages;

f. An order that Defendant pays Plaintiff's costs associated with bringing this lawsuit, including his reasonable attorneys' fees and costs; and

g. A grant of any such further relief as the Court deems necessary and proper in the public interest.

Respectfully submitted, this day of March 1, 2023.

*/s/ Jason H. Coffman*

Jason H. Coffman
Law Office of Jason H. Coffman
Georgia Bar No. 173119
3280 Peachtree Road, NE, 7th Floor
Atlanta, GA
Telephone: (404) 581-3834
Email: jcoffman@jcoffmanlaw.com

Counsel for Plaintiff James Michael Graves

28

Robert E. Barnes, Esq.
*Subject to admission pro hac vice*
235010/CA
Lexis Anderson, Esq.
*Subject to admission pro hac vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Facsimile: (310) 510-6225
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com


Counsel for Plaintiff *James Michael Graves, subject to admission pro hac vice*

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Minneapolis Area Office**
330 South Second Avenue, Suite 720
Minneapolis, MN  55401
(800) 669-4000
Website:  www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 12/01/2022

**To:**  Mr. JAMES M. GRAVES
c/o ROBERT BARNES
BARNES LAW, LLP
700 S. FLOWER STREET, SUITE 1000
LOS ANGELES, CA 90017

Charge No: 410-2022-05894

EEOC Representative and email:          Benjamin Lidholm
                                        Investigator
                                        benjamin.lidholm@eeoc.gov

## DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2022-05894.

On behalf of the Commission,

Digitally Signed By:Julianne Bowman
12/01/2022
Julianne Bowman
District Director

**Cc:** 3M Companies
c/o Laura  Williams
Littler Mendelson, P.C.
2301 MCGEE ST STE 800
Kansas City, MO 64108

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

**IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT**

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

**ATTORNEY REPRESENTATION**

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

**HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS**

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 410-2022-05894 to the District Director at Julianne Bowman, 230 S Dearborn Street

Chicago, IL 60604.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to:
https://www.eeoc.gov/eeoc/foia/index.cfm.